UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

KIMBERLY J. RYAN,                          )
                                           )
            Plaintiff,                     )
                                           )
      vs.                                  )       Case No. 2:14-CV-0037 (CEJ)
                                           )
CAROLYN W. COLVIN, Acting                  )
Commissioner of Social Security,           )
                                           )
            Defendant.                     )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I.  Procedural History

On August 5, 2011, plaintiff Kimberly J. Ryan filed an application for disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq.*, with an alleged onset date of August 4, 2010.[1]  (Tr. 139-45, 153-54).  Her insured status under Title II expired on December 31, 2010.  (Tr. 22, 165).  After plaintiff's claim was denied initially and on reconsideration (Tr. 90, 92), she requested a hearing before an Administrative Law Judge (ALJ).  (Tr. 100-101).

Plaintiff and counsel appeared for the hearing on October 30, 2012.  (Tr. 38-89). The ALJ issued a decision denying plaintiff's application on December 12, 2012 (Tr. 17-37).  The Appeals Council denied plaintiff's request for review on January 23, 2014. (Tr. 1-6).  Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II. Evidence Before the ALJ

### A.  Disability Application Documents

---

[1] Plaintiff initially alleged an onset date of March 13, 2008.  On September 29, 2012, she submitted a statement to the Social Security Administration amending her alleged onset date of disability to August 4, 2010.  (Tr. 153-54).

In her Disability Report filed on August 15, 2011 (Tr. 168-75), plaintiff listed her disabling conditions as neuropathy, depression, anxiety, diabetes, and hypertension. She took prescription medications for acid reflux, blood pressure, irritable bowel syndrome, neuropathy, blood pressure, high cholesterol and triglycerides, diabetes and depression. Plaintiff was 5'1'' tall and weighed 229 pounds. (Tr. 169). She remarked that her husband was out of town 90% of the year for work, and her daughter helps her pay her bills, cook dinner, complete housework, and pick up her food and medications. (Tr. 175). She also noted that she had fallen twice in the past two months because of her neuropathy, and had numbness in her feet and legs.

In her Function Report completed on August 28, 2011 (Tr. 186-200), plaintiff listed her daily activities as having coffee, watching television, talking on the phone, feeding her cats, and showering every other day. She noted that her daughter lived close by and sometimes brought food to her. Otherwise, plaintiff prepared soups, cereal, and sandwiches on a daily basis for herself. Plaintiff stated that her medicines make her tired, and that she falls "a lot" because of problems with her legs and feet. (Tr. 190). She also reported not sleeping much at night and napping during the daytime. Plaintiff could dress and shower on her own, but could not get out of the bathtub by herself. (Tr. 191). She shopped twice a month, and stated it took a long time because she found the motor carts were difficult to operate. (Tr. 193).

Plaintiff further noted in her Function Report that she could not sit in one position for very long because of pain, so she would "lay around a lot" or try to move around to placate the pain. (Tr. 194). She could not drive, because she could not sit for long periods of time. (Tr. 199). Plaintiff's social activities included spending time with friends and family who sometimes visited her. She went to church on holidays. When she went out, her daughter accompanied her. Plaintiff reported an inability to climb a

flight of steps without resting for a few minutes.  She could follow written instructions if she understood them.  She reported that she walked away from her previous job because she was about to get into a fight, and as a result she was terminated.  (Tr. 196).  Plaintiff did not handle stress well, and became shaky and cried a lot.  She reported using a cane regularly.

Plaintiff's daughter, Rebekah Christian, completed a Third-Party Function Report on August 29, 2011.  (Tr. 210-18).  Ms. Christian spent more than three hours per day with plaintiff.  She reported that plaintiff's daily activities consisted of taking naps, drinking coffee, watching television, smoking on her porch, talking on the phone, using a computer, taking medications, and visiting Ms. Christian's home  three nights a week.  Ms. Christian stated that she took care of plaintiff's two cats, did her laundry, prepared her dinner, and did her shopping and housework.  (Tr. 212).  She noted that plaintiff became drowsy after taking her medication, and wakes throughout the night with leg pain and discomfort.  Ms. Christian ensured that plaintiff took her medications timely.  Plaintiff could not stand at the kitchen stove for any length of time to prepare food due to the weakness and numbness in her legs.   (Tr. 213).

Ms. Christian also stated that plaintiff did not socialize or go to public places unless absolutely necessary.  Plaintiff was able to drive to pick up her prescription medications three times a month.  Ms. Christian paid her mother's bills and handled her financial affairs.  Plaintiff had very strained relationships with everyone due to her emotional state, nerves, and anxiety.  (Tr. 215).  She was very withdrawn and anti-social.  Ms. Christian did not report plaintiff's use of a cane.  (Tr. 217).  Plaintiff had an 8th grade education and had difficulty with following instructions and  concentration.  She also had difficulty with lifting, sitting, climbing stairs, squatting, standing, kneeling, bending, and walking.  (Tr. 218).

In a Function Report filed on November 15, 2011 (Tr. 219-24), plaintiff stated that her feet were worse and she was falling more frequently, which caused a recent back and foot injury. She stated that she had chipped a bone in her right foot from a fall, and had begun physical therapy for her back injury. She had to take shorter showers, and could not sit, stand, or walk for long periods. (Tr. 222). Plaintiff also reported that her anxiety had worsened, as she became upset by having other people do things for her. (Tr. 223). She stated that it was overwhelming to not be able to do things she loved, such as yard work and playing with her grandchildren.

In a statement she provided on September 28, 2012 (Tr. 229-30), plaintiff reported she had quit her last job, because it had "just got to the point where it wasn't worth the stress and I couldn't deal with it." Stress made her physically ill. She stated that it was difficult to get out of bed in the morning, and she had to scoot out of bed and use a walker. If she did not have an appointment, she would sit around, keeping everything she needed near her recliner. Plaintiff also stated she paced around and "had a problem with OCD in the past with cleaning." (Tr. 229). She also reported problems with her memory.

### B. Testimony at the Hearing

Plaintiff was 47 years old at the time of the hearing (Tr. 139). She lived with her husband, who was out of town 90% of the time. (Tr. 44). The highest grade she completed in school was eighth grade, and she did not have a GED. (Tr. 45). She did not work, because of her anxiety and because it took her three hours to get out of bed in the morning. (Tr. 45, 66). She had to scoot out of bed on her stomach, use a walker, and could neither stand nor sit for long. She props both her legs and feet up three to four times a day for 20-30 minutes at a time to lessen swelling because of neuropathy. She brought a cane to the hearing, and said she had been using it since

before December 2010.  Initially she did not have a prescription for the cane, but in May 2012, after she had major back surgery, both the cane and a walker were prescribed.  (Tr. 46-47, 63).

Prior to December 2010, plaintiff experienced "a lot" of back pain and could not bend over.  (Tr. 47).  When she stood, her upper thighs went number and she would need to sit down for a while.  She could stand for 15-20 minutes at time.  Overall, her back condition was about the same in terms of severity since August 2010, until it worsened in 2012.  (Tr. 49).  In May 2012, she had back fusion surgery with a cage.  (Tr. 48).  Prior to December 2010, she received physical therapy for her back problems.

Plaintiff had neuropathy in her legs because of diabetes.  (Tr. 52).  Plaintiff testified that her legs would frequently give out on her causing her to fall, and she had numbness in her feet and upper thighs.  She also had anxiety that caused problems with the job she had prior to 2010.  Once, plaintiff threatened to "rip [a co-worker's] face off."  (Tr. 53).  Plaintiff walked off the job and never returned.  Her anxiety and depression also caused her to be absent from work.  (Tr. 54).  She additionally experienced shortness of breath.  (Tr. 65).  Stress caused her to "just want to shut everybody out."  (Tr. 65).

In 2010, plaintiff took a low dose of Xanax for anxiety.  The medicine caused her to fall asleep but helped when she was awake.  (Tr. 54-55).  She stopped taking Xanax in 2012, prior to her back surgery, and began taking Valium.  (Tr. 55).  Plaintiff had been taking an antidepressant, Lexapro, since her mother died in 1981.  (Tr. 55-56).  She had temporarily seen a mental health provider after her mother's death, but had not since returned.  (Tr. 56).  Her anxiety and depression caused her to cry often and she had a short fuse.  (Tr. 56, 69).  Plaintiff had problems dealing with other people because she would take things the wrong way, causing conflicts with her family.  (Tr.

57).  She testified to past problems with compulsive behavior, such as playing with pieces of adhesive tape and frequently vacuuming, wiping surfaces, and moving things. (Tr. 67).

On a typical day, plaintiff stayed at home, drank coffee, and watched television. (Tr. 57).  She did light household chores, but her daughter vacuumed and did the laundry.  She did not go shopping, because she could not walk through a store for too long.  She occasionally visited her grandchildren at her daughter's house.  (Tr. 58). She had two cats and a small dog that were mostly cared for by  her daughter.  (Tr. 59).  In 2010 she slept approximately four hours a night, and napped a few hours a day five days a week.  (Tr. 61-62).  She used a grabber on a stick to dress herself.  (Tr. 64).  She used a shower chair that was prescribed for her in May 2012.  Plaintiff testified to an inability to concentrate on paperwork, and stated that her daughter had taken care of her bills since 2008.  (Tr. 68).  She testified to calling her daughter "20 plus" times a day.  (Tr. 70).

The ALJ asked plaintiff about her past work experience.  (Tr. 78-80).  From 2005 to 2008, plaintiff had worked full time as a secretary, answering phones and filing papers.  While plaintiff reported other jobs she had performed in the 15 years prior to the date she was last insured, the secretarial position was the only job performed at a substantial gainful activity level.

Michael J. Wiseman, a vocational expert, provided testimony regarding the employment opportunities for an individual of plaintiff's age, education, and work experience, who is able to lift and carry 20 pounds occasionally and 10 pounds frequently, stand, walk, or sit for six hours in an eight hour work day, and can occasionally climb ramps and stairs but does not climb ladders, ropes or scaffolds.  The ALJ asked the vocational expert if this individual could perform any of the plaintiff's past

relevant jobs. Mr. Wiseman opined that such a person could perform work as a secretary, which is at the skilled, sedentary level, and also could perform work at the unskilled, sedentary level. (Tr. 81). Specifically, such an individual could perform the job of an order clerk in the food and beverage industry. At the light level, Mr. Wiseman stated that such an individual could perform the job of an arcade attendant or parking lot attendant. (Tr. 82).

The ALJ next asked Mr. Wiseman if there were any job positions for an individual with the same limitations as in the first hypothetical, but was further limited to simple and routine tasks with occasional contact with co-workers, supervisors, and the public. Mr. Wiseman opined that neither plaintiff's past secretarial work nor the jobs previously mentioned were options for such an individual. However, such an individual could perform the job of a housekeeper or an electronics assembler. (Tr. 83).

In a third hypothetical, the ALJ asked the vocational expert if there were any jobs for an individual with the mental limitations stated in the second hypothetical and with physical limitations that limited the individual to sedentary work, and who would be able to stand, walk or sit two hours total in an eight hour work day, but would need to be off the feet for up to five minutes for every 30 minutes of standing, walking or sitting; had no operation of foot controls with the bilateral lower extremities; no ladder, rope or scaffold climbing; occasional ramp, stair climbing, occasional stooping, balancing, kneeling and crouching; no driving automotive equipment; and no working at unprotected heights or around hazardous machinery. (Tr. 84). Mr. Wiseman opined that there was a large range of sedentary, unskilled work for such a person. Specifically, such an individual could perform the job of a table worker who works on parts on a table and as a clerical mailer or addressor. Mr. Wiseman noted that the Dictionary of Occupational Titles (DOT) does not deal with the sit/stand option the ALJ

gave, and his opinion was based on his experience placing individuals in the regional and national economy. (Tr. 84-85).

In a fourth hypothetical, the ALJ asked Mr. Wiseman if there was any work for a hypothetical person with all of the limitations of the third hypothetical, and with the further limitation of only being able to sit for two hours in an eight hour work day. (Tr. 85). The vocational expert opined that this additional factor would eliminate all competitive work. Plaintiff's counsel then asked the vocational expert to return to the first hypothetical, and asked if such a person could perform the occupations listed if the person would need to assume a reclining position for up to 30 minutes, one to three times a day. (Tr. 86). Mr. Wiseman opined that this factor would eliminate competitive employment. (Tr. 87).

Due to his concern for the lack of medical records from the time period for which plaintiff was seeking disability benefits, the ALJ gave plaintiff's counsel three weeks to obtain an additional medical statement from Dr. Chad Smith regarding plaintiff's condition in 2010 to assist in the ALJ's review of the evidence. (Tr. 72-76, 88).

## C. **Medical Records**

On August 7, 2008, plaintiff sought treatment at the St. Charles Medical Clinic for bilateral foot pain from her toes to anterior shin, which had been ongoing for approximately two weeks. (Tr. 301-03). She stated that her feet felt "like they're on fire." (Tr. 301). The pain was described as equal, constant, and interfered with her sleep. A history of tarsal tunnel syndrome[2] per imaging was noted, with no surgery. Plaintiff was diagnosed with diabetes mellitus type II without complications and

---

[2] Tarsal tunnel syndrome is a compression, or squeezing, on the posterior tibial nerve that produces symptoms anywhere from the inside of the ankle into the foot. Tarsal tunnel syndrome can be caused by systemic diseases such as diabetes or arthritis that cause swelling and thus compress the nerve.
http://www.foothealthfacts.org/footankleinfo/tarsal-tunnel-syndrome.htm (last visited January 29, 2015).

unspecified mononeuritis[3] of the lower limb. (Tr. 303). It was noted that plaintiff's pain could be attributed to tarsal tunnel, and she was advised to follow-up with an orthopedic physician. Plaintiff was recommended to try Neurontin[4] with tapering for discomfort.

Plaintiff was referred to Richard B. Helfrey, D.O. at St. Peters Bone & Joint Surgery on September 22, 2008. (Tr. 237-38). She reported a several month history of numbness and burning sensation in both of her feet. Gabapentin4 had not had a significant effect. An EMG nerve conduction velocity evaluation had demonstrated a normal EMG of both the legs and feet. A nerve conduction velocity evaluation showed marginal evidence of lateral plantar nerve entrapment on the right. She had a good range of motion in her knees, ankles and subtalar joints. Her deep tendon reflexes were brisk and symmetric. Dr. Helfrey's opinion was that plaintiff had bilateral tarsal tunnel entrapment.2 He also opined that she could have underlying diabetic neuropathy, which would then substantiate a double crush phenomenon to the bilateral feet. The doctor determined to start her slowly with some stretching and flexibility work to her calves, since they were exceedingly tight. He continued her on the gabapentin, and scheduled a follow-up appointment. He also broached the subject of surgical intervention with release, which he did not feel was mandatory at that time. Dr. Helfrey stated that he preferred non-operative intervention, which was "absolutely reasonable." (Tr. 238).

Plaintiff returned to St. Charles Medical Clinic on October 20, 2008, reporting right lower back pain for the past 48 hours. (Tr. 298-301). The pain had started after

---

[3] Mononeuritis is a group of symptoms that is a form of damage to one or more peripheral nerves. Symptoms include tingling, burning, pain or other abnormal sensations in one or more areas of the body.
http://www.nlm.nih.gov/medlineplus/ency/article/000782.htm (last visited on January 29, 2015).

[4] Neurontin, or gabapentin, is used to help control certain types of seizures in people with epilepsy and to relieve the pain of postherpetic neuralgia, the pain or aches that may occur after attack of shingles. It is also prescribed to treat restless legs syndrome, diabetic neuropathy, and hot flashes.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694007.html (last visited on January 29, 2015).

carrying things into the house on Saturday, pulling a lower back muscle. Pain radiated into the front of her legs, and they felt a little numb. Plaintiff was diagnosed with lower back pain with radiation and blood in her urine. She was instructed to continue Tylenol and Aleve, use heat as needed, and to not do any heavy lifting. She stated that Tramadol[5] did nothing for her pain in the past. She was advised to consult with Dr. Smith for a refill of Vicodin and incidental refill of Xanax as needed for her anxiety.

On November 7, 2008, plaintiff saw Chad J. Smith, D.O., at the St. Charles Medical Clinic for a follow-up from an emergency room visit. (Tr. 292-98). She complained of right lower quadrant abdominal pain for the previous three weeks. An emergency room visit revealed "blood on the dipstick" and a white blood cell count of 12,000, indicating a kidney infection. (Tr. 292). Plaintiff also had marked lipid and triglyceride elevations. Dr. Smith prescribed a microscopic urinalysis and culture, an ultrasonogram of her pelvis, Gemfibrozil,[6] and follow-up in one week. Plaintiff's urine testing was normal, without a significant amount of blood. The urine culture was also negative for infection. Plaintiff was notified of the results and was given a refill of Metformin.[7]

Plaintiff was seen by Rozella Ranes, M.D., at St. Charles Medical Clinic on May 13, 2009 for complaints of week-long right shoulder pain. (Tr. 283-88). She had restricted range of motion with pain when trying to lift things or lift her arm above her head. She reported taking up to 6 or 7 Aleve tablets per day with only minimal relief.

---

[5] Tramadol is used to relieve moderate to moderately severe pain. It is an opiate analgesic that works by changing the way the brain and nervous system respond to pain.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695011.html (last visited January 29, 2015).
[6] Gemfibrozil, or Lopid, is a medication used to reduce the amount of cholesterol and triglycerides in the blood in certain people with very high triglycerides who are at risk of pancreatic disease.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a686002.html (last visited January 29, 2015).
[7] Metformin is used to treat Type II diabetes by helping to control the amount of glucose in the blood.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a696005.html (last visited January 29, 2015).

Dr. Ranes diagnosed plaintiff with rotator cuff tendinitis[8] with a trapezius strain. She was prescribed Naproxen,[9] Tramadol,5 Carisoprodol,[10] and instructed to apply heat to the neck area. Plaintiff stated that if there was no improvement over the next week she would consider physical therapy. Her diabetes was under control with no complications. Dr. Ranes also discussed treatment of plaintiff's anxiety. She had been on multiple regimens in the past and none seemed to work better than her current regimen of Lexapro and Xanax. Following blood work, Dr. Ranes noted to inform plaintiff that while her diabetes seemed to be under control, her cholesterol and triglycerides were very elevated despite her taking Lopid.6 Dr. Ranes recommended discontinuing Lopid and starting on Antara[11] for her triglycerides and Lipitor[12] for her cholesterol. The doctor provided the prescriptions and suggested a follow-up in six weeks.

On August 17, 2009, an x-ray of plaintiff's right shoulder was negative for fracture or dislocation. (Tr. 318). The joint spaces were intact. The nurse practitioner at St. Charles Medical Clinic recommended physical therapy since plaintiff's right shoulder had limited passive range of motion due to stiffness and pain with a palpable radial pulse. (Tr. 279-82). Plaintiff cried and responded that she did not want physical therapy since she felt it would aggravate her pain. The nurse practitioner advised a

---

[8] Symptoms of rotator cuff tendinitis include mild pain that occurs with overhead activities and lifting an arm to the side. Pain also may occur with lowering the shoulder from a raised position.
http://www.nlm.nih.gov/medlineplus/ency/article/000438.htm (last visited January 29, 2015).
[9] Naproxen is the generic name for Naprosyn, a nonsteroidal anti-inflammatory drug used for relief of the signs and symptoms of tendonitis and pain management. See Phys. Desk Ref. 2769-70 (60th ed. 2006).
[10] Carisoprodol is a medication used to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682578.html (last visited January 29, 2015).
[11] Fenofibrate, or Antara, is a medication used with other medications, diet, and exercise, to reduce cholesterol and triglycerides in the blood and increase the amount of high-density lipoproteins in the blood.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601052.html (last visited January 29, 2015).
[12] Atorvastatin, or Lipitor, is used with diet, weight loss, and exercise to reduce the risk of heart attack and stroke and decrease the need for heart surgery in persons with heart disease or at risk of developing heart disease.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a600045.html (last visited January 29, 2015).

follow-up examination with the orthopedic physician in six week as plaintiff had planned. Plaintiff also stated that she had had bilateral toe numbness and burning for a few months. She was wearing flip-flops, had palpable pedal pulses, and a normal range of motion. It was recommended that she wear more supportive footwear, and she was instructed to follow-up with a podiatrist or orthopedist. Her cholesterol and low-density lipoprotein levels were better, but still above goal. Her triglycerides were normal. The nurse practitioner suggested she try Zetia.[13]

Plaintiff had a follow-up appointment on November 10, 2009 with Dr. Ranes for her diabetes, anxiety, and hyperlipidemia. (Tr. 275-78). She stated that she felt well, overall. Dr. Ranes found that plaintiff's anxiety was stable, and prescribed continued use of Lexapro. The doctor noted that increasing Xanax would help with plaintiff's perimenopause. She also recommended a lipid profile to check plaintiff's hyperlipidemia, and a hemoglobin A1C test for her diabetes. She instructed plaintiff to continue with her current diabetes medications, and would call her with the blood work results. After blood work, Dr. Ranes notified plaintiff that her cholesterol and triglycerides were still high. She was referred to a lipid specialist and a dietician.

Plaintiff returned to see Dr. Ranes on December 22, 2009 with complaints of congestion, a sore throat, swollen glands, nasal blockage and post-nasal drip for two weeks. (Tr. 272-74). Plaintiff also stated she had fallen on her back three days ago while getting out of a car. She stated she had significant lower back, left hip, and leg pain. She had taken four tablets of Aleve four times a day for the past few days. The pain still was not controlled, and was worse with certain movements. She did not have numbness or tingling, but did have pain radiate into the left leg. She reported difficulty sleeping at night due to the pain. Plaintiff's back was tender to palpitation over the

---

[13] Ezetimibe, or Zetia, reduces the amount of cholesterol and other fatty substances in the blood. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603015.html (last visited January 29, 2015).

lumbosacral spine, but was worse over the paraspinal muscles on the left and over the left sacroiliac joint.  Plaintiff was diagnosed with acute bronchitis, prescribed Zithromax and advised to cease smoking.  She was also diagnosed with lumbar sprain, strain, and sciatica, and prescribed Flexeril,[14] Vicodin, and Naproxen.[15]  She was instructed to follow-up over next few weeks if no improvement and to consider physical therapy.  At a follow-up appointment with Dr. Ranes on May 11, 2010, there were no complications with plaintiff's diabetes, and it was being controlled with her current medications.  Plaintiff's cholesterol was still high along with her triglycerides, despite the use of Antara.11  Dr. Ranes recommended adding Lovaza[16] as well.

On June 29, 2010, plaintiff saw Chad J. Smith, D.O. at St. Charles Medical Clinic for lower back and buttock pain on her left side from doing yard work and push mowing at home.  (Tr. 260-63).  The pain increased with movement but improved with rest.  Upon examination of her back, Dr. Smith found that her range of motion was mildly limited.  He noted a right foot ulcer.  Dr. Smith diagnosed plaintiff with sciatica and a skin rash.  She was prescribed Norco,[17] Fluconazole,[18] and was taught lower back exercises.

Plaintiff returned to Dr. Smith on August 5, 2010, stating that she had bent over to move some furniture the previous night and "felt something rip."  (Tr. 258-60).  She had pain in her left lower back, buttocks, and radiation to her left  leg had worsened since the incident.  She had been attending physical therapy.  On examination, her

---

[14] Cyclobenzaprine, or Flexeril, is a medication used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682514.html (last visited January 29, 2015).
[15] Naproxen is a nonsteroidal anti-inflammatory drug used to relieve pain, tenderness, swelling, and stiffness resulting from a variety of causes.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681029.html (last visited January 29, 2015).
[16] Lovaza is an omega-3-acid ethyl ester used to reduce the amount of triglycerides in the blood.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a607065.html (last visited January 29, 2015).
[17] Norco is a combination of hydrocodone and acetominophen.  See Phys. Desk. Ref. 3188 (63rd ed. 2009).
[18] Fluconazole treats fungal infections, including yeast infections.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a690002.html (last visited January 29, 2015).

back's range of motion was moderately limited. She had a limp. Dr. Smith recommended an x-ray of the left spine, and suggested an MRI if the x-ray was negative but her symptoms had worsened. She was also given a Norco refill for the pain.

On September 20, 2010, plaintiff went to St. Charles Medical Clinic with reports of lower abdominal pain, lower back pain, and frequent urination for three days. (Tr. 255-57). She also reported a fever for the past two evenings. She was referred to the emergency room for further evaluation, but stated she was not sure if she was going to go. She was concerned she had a urinary tract infection, but was told she could not rule out appendicitis, ovarian cyst, and other complications.

Plaintiff had an ultrasound of her abdomen at St. Joseph Hospital West on January 26, 2011. (Tr. 319-21). She had had epigastric pain for one week with abnormal liver function. Anil Khosla, M.D., found that plaintiff had hepatomegaly[19] with hepatic steatosis,[20] and focal adenomyomatosis[21] of the gallbladder. There was no finding to suggest gallbladder inflammation.

On January 28, 2011, plaintiff saw James R. Grimes, M.D., at Patients First Health Care. (Tr. 369-71). Her hyperlipiedemia, hypertension, and diabetes were stable and controlled with medication. Risk factors for these conditions included her tobacco use, obesity, and sedentary lifestyle. Dr. Grimes noted that plaintiff's extremities appeared normal and that plaintiff's compliance with diet, exercise and medication was good. Plaintiff was also doing well on Lexapro for her depression. She had been on Xanax for a long time, and the plan was to taper her use of it. Plaintiff

---

[19] Hepatomegaly is swelling of the liver beyond its normal size.
http://www.nlm.nih.gov/medlineplus/ency/article/003275.htm (last visited February 2, 2015).
[20] Nonalcoholic fatty liver disease. http://www.mayoclinic.org/diseases-conditions/nonalcoholic-fatty-liver-disease/basics/definition/CON-20027761?p=1 (last visited February 2, 2015).
[21] Adenomyomatosis of the gallbladder is a benign tumor consisting of muscle and glandular elements in the gallbladder. See Dorland's Illus. Med. Dictionary 29 (32nd ed. 2012);
http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3104642/ (last visited February 3, 2015).

complained of abdominal discomfort that had been ongoing for a week.    She categorized her pain as severe, and had been unable to sleep the night before.    She had been taking Percocet.[22]    Dr. Grimes wanted to hospitalize her for pain control and diagnostic evaluation.    His concern for an ulcer or pancreatitis was highest.    Plaintiff declined admission.    An x-ray taken days later showed a large amount of retained stool within the colon consistent with constipation.    (Tr. 393-94).

On April 19, 2011, plaintiff was seen by Dr. Grimes for hand pain radiating to her left arm.    (Tr. 335-36, 343).    The pain was sharp and throbbing.    Plaintiff had fallen down the stairs at home that day.    Her symptoms included decreased mobility, swelling, tenderness, and weakness.    An x-ray showed no acute bone abnormality, but some soft tissue swelling near the fifth metacarpal head.    Dr. Grimes determined that plaintiff had an acute contusion of the hand.    He recommended rest, ice, compression, elevation, and Motrin, and instructed her to call if she did not see improvement.

Plaintiff was admitted to Mercy Hospital on May 4, 2011 for endometrial abscess. (Tr. 239-45).    She reported a constant sharp pain that waxed and waned in the right lower abdomen.    The pain radiated around to her back.    The medical provider suspected pelvic inflammatory disease after initial examination and began intravenous treatment of antibiotics.    She was discharged on May 9, 2011 after an operative drainage of the abscess.    On May 12, 2011, plaintiff had a transabdominal and endvaginal pelvic ultrasound with nonspecific findings.    (Tr. 395-95).    On May 27, 2011, plaintiff visited St. Charles Medical Clinic for a pre-operative consultation for a total hysterectomy due to uterine abscess.    (Tr. 248-54).    It was recommended that she proceed with surgery as planned.

---

[22] **Error! Main Document Only.**Percocet is a combination of Oxycodone and Acetaminophen.  Oxycodone is an opioid analgesic indicated for relief of moderate to moderately severe pain.  It can produce drug dependence.  See Phys. Desk. Ref. 1114 (60th ed. 2006).

Plaintiff saw Dr. Grimes on July 26, 2011 for a follow-up for her diabetes, hyperlipidemia, hypertension, and depression. (Tr. 332-34). Dr. Grimes diagnosed her with major depressive disorder and prescribed a two-week trial of Viibryd[23] as an alternative to Lexapro per plaintiff's request. Her diabetes stable. On July 27, 2011, Timothy P. Long, M.D., noted that plaintiff's lipids were elevated and she should come in to review statin[24] therapy. (Tr. 345-47). At a two-week follow-up appointment for her depression and hyperlipidemia, plaintiff stated she was doing better but was still very anxious. (Tr. 330-31). Dr. Grimes decided to continue her with the Viibryd and gave her a prescription for Xanax to use as needed. Plaintiff was also referred to a dietician for dietary intervention.

On September 15, 2011, plaintiff saw Dr. Grimes with complaints of an acute backache. (Tr. 450-51). The pain was in her lower back and began three weeks prior. There was radiation of pain into her buttocks, legs, and feet. She described the pain as sharp and throbbing. Symptoms were aggravated by lifting. Plaintiff stated the pain would wake her up during the night when she moved. Upon physical examination, her back and spine were very tender over the superior aspect of her sacroiliac joint on the right. Dr. Grimes advised physical therapy and hydrocodone.

On September 22, 2011, Despine Coulis, M.D., completed a Physical Residual Functional Capacity Assessment for plaintiff as a medical consultant. (Tr. 372-77). Dr. Coulis opined that plaintiff could occasionally lift or carry a maximum of 20 pounds, and frequently lift or carry a maximum of 10 pounds. Plaintiff could stand or walk with normal breaks for a total of about 6 hours in an 8-hour workday, and sit for a total of about 6 hours in an 8-hour workday. Plaintiff could push or pull without limits to her

---

[23] Viibryd, or vilazodone, is a selective serontonin reuptake inhibitor and 5HT1A receptor partial agonist that increases the amount of serotonin in the brain.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a611020.html (last visited February 2, 2015).
[24] Statins are drugs used to lower cholesterol. http://www.nlm.nih.gov/medlineplus/statins.html (last visited February 2, 2015).

upper or lower extremities. Dr. Coulis based her conclusions on the fact that plaintiff's diabetes was well-controlled with Metformin, she did not use insulin, she had no episodes of symptomatic hyperglycemia or hypoglycemia, and her hemoglobin A1C's were less than 7%. Dr. Coulis also noted that plaintiff was obese with a height of 5'2'', weight of 232, and BMI of 41. Plaintiff's hypertension was controlled with Lisinopril,[25] beta blockers, and hydrocholorothiazide.[26] She had no complaints of headache and no hypertensive urgencies.

Dr. Coulis remarked that plaintiff had possible neuropathy of both feet with symptoms since 2008, but had a normal EMG. Dr. Coulis noted that a September 2008 orthopedic examination that indicated that tarsal tunnel syndrome was a more likely diagnosis, and that exercises for improving stretch and flexibility had been recommended to plaintiff. Also, primary care medical evidence from the past year had not included any mention of pain in her feet or other neuropathic syndromes, either as an office complaint or a physical finding.

Dr. Coulis noted that plaintiff had left her last job for non-medical reasons. As to plaintiff's postural limitations, Dr. Coulis noted that plaintiff would occasionally have problems with climbing ramps, stairs, ladders, rope, or scaffolds, and frequently have problems with balancing, stooping, kneeling, crouching, and crawling. Plaintiff had no manipulative, visual, communicative, or environmental limitations. There was no evidence to show problems with balance or with gait.

Dr. Coulis found that plaintiff's allegations were more severe than could be supported by medical evidence. Plaintiff visited her primary care physician on a regular basis and was provided with gabapentin refills, but there was no medical evidence in

---

[25] **Error! Main Document Only.**Lisinopril is indicated for the treatment of hypertension. See Phys. Desk Ref. 2053 (61st ed. 2007).
[26] Hydrocholorothiazide is used to treat high blood pressure.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682571.html (last visited February 2, 2015).

the physician reports to support any current serious dysfunction from a neuropathic or musculoskeletal problem concerning her feet. Dr. Coulis concluded that plaintiff's obesity would not preclude her from walking or standing six hours a day, considering her young age.

On September 22, 2011, Mark Altomari, Ph.D., completed a Mental Residual Functional Capacity Assessment of plaintiff. (Tr. 378-80). Dr. Altomari found that plaintiff had moderate limitations in her ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, and to respond appropriately to changes in the work setting.

Dr. Altomari also completed a Psychiatric Review Technique. (Tr. 378-80). Dr. Altomari concluded that plaintiff suffered from major depressive disorder. Plaintiff had moderate difficulty in maintaining concentration, persistence, or pace; she had mild restrictions of daily living activities and mild difficulties in maintaining social functioning. Dr. Altomari noted that on January 28, 2011, plaintiff's depression was in full remission on medication; on July 26, 2011 it was described as being under suboptimal control; on August 9, 2011 her depression was described as doing better, but she was still very anxious. He also noted that plaintiff's daily activities demonstrated limitations related primarily to her physical condition.

Plaintiff underwent an initial evaluation for physical therapy at Excel Sports & Physical Therapy on October 11, 2011. (Tr. 400-404). At the evaluation, plaintiff complained of low back pain radiating into her right thigh with numbness for the past two months. She reported difficulty sleeping, walking after getting out of bed, switching between sitting and standing at the end of a day, driving more than five miles, putting on pants, and grocery shopping for more than 15 minutes. Plaintiff had been non-compliant with a home exercise program from a previous bout of physical

therapy for her lower back. In the physical therapist's opinion, plaintiff's overall rehabilitation potential was fair. The expected length of therapy services required to address her condition was estimated to be four weeks. Plaintiff exhibited a good understanding and performance of the therapeutic activity and instructions outlined in this skilled rehabilitation session. She tolerated the treatment with mild complaints of pain or difficulty. She demonstrated transverse abdominis weakness and decreased lumbar range of motion altering biomechanics during daily living activities. She was instructed on the independent performance of a home exercise program, addressing the problems and achieving the goals outlined in her plan of care.

At her physical therapy session on October 13, 2011, plaintiff noted that she had had a worsening of symptoms over the past day. (Tr. 405-407). She had significant difficulty obtaining a good night's sleep and increased right thigh numbness. However, she stated she did feel better after her initial visit. After a number of exercises, plaintiff tolerated treatment with mild complaints of pain or difficulty. She had decreased tissue flexibility limiting nerve mobility and range of motion. Plaintiff was educated on nerve glides. Plaintiff also returned to Dr. Grimes that day for treatment of her lower back pain. (Tr. 452-54). She described the pain as an ache, numbness, and sharp. The first two physical therapy sessions did appear to be helping. Dr. Grimes decided to refill her pain medication for the short term until the physical therapy had more time to be effective.

During her physical therapy session on October 14, 2011, plaintiff tolerated exercise well. (Tr. 408-10). She was instructed to continue with her current rehabilitation program. Plaintiff cancelled her appointment on October 18, 2011, stating she had fallen down in her yard and chipped a bone in her foot. (Tr. 411). At her session on October 20, 2011, plaintiff's lower back was sore from a fall in which she

stated that she had broken her foot. Plaintiff tolerated exercise treatment that day with minimal complaints of pain or difficulty. She had slight increased lumbar region muscle guarding due to her fall over the weekend. The physical therapist reviewed nerve glides with her to ensure proper technique prior to adding an exercise to her home exercise plan.

Plaintiff was seen again for physical therapy on October 21, 2011. (Tr. 415-17). She rated her pain that day at approximately "5" on a 10-point scale. The pain was greatest in the morning and night. She tolerated the therapeutic activity with mild complaints of pain and difficulty. Plaintiff cancelled her physical therapy appointment on October 25, 2011 due to illness. (Tr. 418). On October 27, 2011, plaintiff stated that her lower back was feeling "good." (Tr. 419-21). She tolerated treatment with moderate complaints of pain or difficulty. She demonstrated a need for occasional-to-frequent cueing to properly activate her transverse abdominis muscles. By October 28, 2011, she had improved her transverse abdominis activation without requiring excessive cueing. (Tr. 422-24). She stated that her back was feeling quite sore, however. She reported that her neuropathy was acting up that morning, causing difficulty walking.

On November 1, 2011, the physical therapist noted that plaintiff's symptoms had remained relatively unchanged since her initial evaluation. (Tr. 425). Plaintiff stated that she felt better immediately after physical therapy, but her symptoms returned by the end of the day or the next morning. Plaintiff tolerated treatment with minimal complaints of pain or difficulty. The treatment plan was to resume manual therapy mobilizations to her lumbar and sacral regions. On November 3, 2011, plaintiff reported that she was generally unchanged. (Tr. 428-30). She noted some overall improvement, but had continued soreness. An exercise bike with a walking shoe for

her fracture did not irritate her foot; however, she quickly had shortness of breath and required many breaks throughout a 10-minute cycle. The physical therapist suggested that plaintiff get a bike at home for her general health, to manage her diabetes, and for weight loss.

On November 4, 2011, plaintiff stated that she felt moderate improvement after her last treatment. (Tr. 431-33). She was pleased with her progress, and noted her best pain relief to date. On November 8, 2011, plaintiff reported recent resolution of her low back pain. (Tr. 434-36). However, her buttocks symptoms remained unchanged. She stated that her symptoms primarily caused difficulty walking, sleeping, or driving. The physical therapist planned to contact plaintiff's medical doctor with a report of her progress to determine whether plaintiff should continue physical therapy services.

On November 10, 2011, plaintiff had severe pressure localized to the L5-S1 region causing significant difficulty getting out of bed the previous day. (Tr. 437-41). She saw no improvement of these symptoms with the use of a moist heat pack or ice. She tolerated treatment that day with moderate complaints of pain or difficulty. Plaintiff also saw Dr. Grimes for her lower back pain on November 10. (Tr. 455-56). She reported feeling numbness and pressure radiating from her low back into her right buttock. She could not get out of bed on her own. Plaintiff noted that she had completed a four-week cycle of physical therapy and had started another. Dr. Grimes determined that plaintiff had an acute disc disorder, intervertebral with myelopathy[27] in the lumbar region. He refilled her pain medication, advised getting an MRI, and planned to refer her to pain management.

---

[27] Myelopathy is a disease of the spinal cord. See Mosby's Med. Dictionary (8th ed. 2009).

At her physical therapy session on November 15, 2011, the severity of the pressure in plaintiff's lower back remained relatively unchanged. (Tr. 442-44). Severe tissue tightness in her lumbosacral region limited her mobility. The physical therapist advised her to continue manual stretching and soft tissue mobilizations prior to joint mobilizations to promote increased mobility. Plaintiff called in sick for her next appointment on November 22, 2011. (Tr. 445). On November 25, 2011, plaintiff reported that she was still sick. (Tr. 446). A record from a later medical appointment indicated that plaintiff's MRI in November 2011 showed multilevel degenerative disc disease from L1 to L5 in her spine, in addition to an L5-S1 lumbar spondylolytic spondylolisthesis[28] with foraminal.[29] (Tr. 467). She had a lumbar epidural steroid injection at L4-L5 at Mercy Hospital on December 22, 2011. (Tr. 397-98).

On January 1, 2012, plaintiff was discharged from her physical therapy program at Excel Sports & Physical Therapy. (Tr. 447-48). The severity of pressure in her lower back had remained relatively unchanged. She had not fully met any of the goals of the program. On January 23, 2012, plaintiff told Dr. Grimes that her epidural steroid injection in late December had not provided her any relief. (Tr. 457-62). Dr. Grimes ordered a steroid taper for plaintiff. The doctor noted that plaintiff's hypertension and diabetes were under control. It was noted that her diabetes was diagnosed in 2005, and her hypertension in 1985. As to her mental health, plaintiff noted that she was not sleeping well, cried frequently, and felt that the pain was "really starting to get to her." (Tr. 461). Dr. Grimes saw plaintiff again on February 20, 2012. (Tr. 463-65). Plaintiff's back pain had lessened with the steroid taper, but the pain was returning and she requested another. Dr. Grimes noted that her backache was under sub-optimal

---

[28] Spondylolisthesis is a condition in which a vertebra in the spine moves forward out of the proper position onto the bone below it. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002240/ (last visited February 3, 2015).
[29] Formaminal spinal stenosis is a narrowing of the spinal column that causes pressure on the spinal cord. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001477/ (last visited February 3, 2015).

control and decided to repeat the steroid taper, but cautioned her regarding the risks of overuse of systemic steroids.

Plaintiff saw Lukasz J. Curylo, M.D., at Orthopaedic Surgery & Sports Medicine on April 9, 2012. (Tr. 467-69). She sought consultation regarding her lower back pain with bilateral leg pain, mostly with paresthesias[30] in both anterior thighs for the past eight months. Dr. Curylo noted that plaintiff had tried extensive conservative therapy including physical therapy, pain management, and spinal injections, all without relief. The pain was worse with any activity except for lying down. Dr. Curylo determined that plaintiff was a candidate for a lumbar laminectomy[31] and decompression and fusion; however, she needed to have the thoracic spine imaged as well. She had four x-rays of her lumbar spine taken that day. The x-rays showed evidence of Grade I L5-S1 spondylolytic spondylolisthesis[28] and bilateral foraminal stenosis.[29] Dr. Curylo was contacted by Dr. Niebruegge concerning plaintiff's CT myelogram of the thoracic spine on April 19, 2012. (Tr. 470). The CT revealed a lot of abnormal vasculature and a high suspicion for an arterlovenous fistula.[32] Dr. Curylo's recommendations were to obtain an MRI angiogram[33] of the entire spine and perhaps a needle angiogram as well. Dr. Curylo approved refills of Norco for plaintiff on April 20, April 30, and May 10, 2012. (Tr. 471-74).

Plaintiff returned for a follow-up appointment with Dr. Curylo on May 7, 2012. (Tr. 473). She agreed to the lumbar decompression and fusion for her L5-S1 spondylolytic spondyiolisthesis. The records indicate she subsequently underwent this

---

[30] Paresthesia refers to a burning, tingling, or numbing sensation.
http://www.ninds.nih.gov/disorders/paresthesia/paresthesia.htm (last visited February 3, 2015).
[31] A surgery that removes a part of the vertebra in the spine to take pressure off the spinal nerves or cord.
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0004636/ (last visited February 3, 2015).
[32] An abnormal connection between an artery and a vein.
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0003018/ (last visited February 3, 2015).
[33] An MRI exam of the blood vessels surrounding the spinal cord.
http://www.hopkinsmedicine.org/interventional_neuroradiology/conditions_procedures/spinal_angiography.html (last visited February 3, 2015).

procedure.   On June 5, 2012, Dr. Curylo noted that plaintiff's preoperative radicular symptoms of lower back pain and sciatica were resolved.   (Tr. 475).   The incision was healing well, staples had been removed, and there was no evidence of infection.   The x-rays taken that day showed a well-healing lumbar decompression and fusion with hardware and graft in place.   Dr. Curylo noted that plaintiff did have some re-aggravation of neuralgia[34] paresthetica[30] in her right anterior thigh likely due to positioning on the operating table.   The doctor noted that the neuralgia paresthetica should be watched conservatively, and plaintiff might need to be referred to a plastic surgeon for decompression.   With respect to her lower back, plaintiff would continue wearing a brace and return for a follow-up appointment in eight weeks.   Dr. Curylo noted that plaintiff was agreeable and appreciative.

Refills of Percocet were approved at plaintiff's request on June 15, June 25, and June 28, 2012.   (Tr. 477-79).   Plaintiff returned to see Dr. Curylo for her post-operation follow-up on July 16, 2012.   (Tr. 480-81).   Her pain had resolved, and she was very happy.   She still had some paraspinal symptoms on her right, but denied any weakness or numbness.   Dr. Curylo instructed her to discontinue use of the brace and begin physical therapy.   He also provided her with refills of Percocet and Valium.   Her lumbar spine x-rays showed a well-healing lumbar decompression and fusion.

On July 26, 2012, plaintiff returned to see Dr. Grimes at Mercy Clinic.   (Tr. 483-86).   Plaintiff's diabetes had been managed with oral medications, but she was experiencing blurred vision and feet dysesthesias.[35]   Plaintiff requested to discontinue Viibryd and return to using Lexapro for her depression.   Her backache was controlled,

---

[34] A sharp pain along a nerve due to irritation or damage to the nerve.
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002380/ (last visited February 3, 2015).
[35] A condition in which an unpleasant sensation is produced by ordinary stimuli.  See Amer. Heritage Med. Dictionary (2007).

and Dr. Grimes encouraged her to start physical therapy. He also recommended she use her walker for the time being.

On October 19, 2012, Dr. Grimes completed a physical Medical Source Statement for plaintiff. (Tr. 490-92). He listed plaintiff's basic strength factors as limited, but found that she retained maximum capacity to frequently lift or carry six pounds, and occasionally lift or carry 10 pounds. She could stand or walk a total of three hours and continuously for 20 minutes at a time. Her ability to push and pull was limited depending on amount of weight. She could never climb, balance, stoop, kneel, crouch, or bend, due to her back pain. She was limited in her ability to reach because of her inflexibility, but unlimited in her ability handling, fingering, feeling, seeing, hearing, or speaking. Dr. Grimes considered it necessary for plaintiff to assume a reclining position for up to 30 minutes 1-3 times a day, a supine position for up to 30 minutes 1-3 times a day, and prop up her legs to a height of 2-3 feet 1-3 times a day while sitting to help her control existing pain or fatigue.

Dr. Grimes also completed a Mental Residual Functional Capacity assessment for plaintiff. (Tr. 493-94). Plaintiff was not precluded from performing work based on her ability to remember locations and work-like procedures, to understand and remember very short and simple instructions, interact appropriately with the general public, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness. She was precluded for up to 5% of an 8-hour work day, excluding breaks, in her abilities to maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance and be punctual and within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them, and complete a normal workday and workweek without interruptions from psychologically-

based symptoms. Plaintiff also was precluded for up to 10% of an 8-hour work day in her abilities to complete a normal workday without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes.

On November 21, 2012, Dr. Chad Smith completed a Medical Source Statement regarding plaintiff's low back pain in 2010. (Tr. 496-97). Dr. Smith opined that plaintiff was limited in her strength, but could frequently lift or carry five pounds. She could stand or walk a total of three hours and sit a total of eight hours in a typical 8-hour workday. She could occasionally bend and never stoop in a working day. During a typical workday, Dr. Smith stated that plaintiff constantly experienced pain or other symptoms severe enough to interfere with attention and concentration needed to perform even simple work tasks. Rest was helpful to plaintiff. She suffered from significant neuropathy in 2010, which impacted her ability to stand or walk. Reclining, assuming a supine position, and propping up her legs for up to 30 minutes, 1-3 times a day were necessary to help plaintiff in regard to controlling her existing pain or fatigue.

### III. The ALJ's Decision

In the decision issued on December 12, 2012, the ALJ made the following findings:

1. Plaintiff last met the insured status requirements of the Social Security Act on December 31, 2010.

2. Plaintiff did not engage in substantial gainful activity during the period from her alleged onset date of August 4, 2010 through her date last insured of December 31, 2010.

3. Through the date last insured, plaintiff had the following severe impairments: diabetes mellitus, a disorder of the lumbar spine, depression, and anxiety.

4.   Through the date last insured, plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.   Through the date last insured, plaintiff had the residual functional capacity (RFC) to perform a range of sedentary work as defined in 20 C.F.R. 404.1567(a). She could stand or walk for two hours during an eight-hour workday, but needed to be off of her feet for five minutes after every 30 minutes of standing or walking; could sit for six hours during an eight-hour workday, but needed to alternate to a standing position at her workstation for five minutes after every 30 minutes of sitting; could not operate foot controls with the bilateral lower extremities, crawl, or climb ladders, ropes, or scaffolding; could not drive automotive equipment; could not work at unprotected heights or around hazardous machinery; could occasionally stoop, balance, kneel, and crouch; and could perform only simple, routine tasks that involved only occasional contact with supervisors, co-workers, and the public.

6.   Through the date last insured, plaintiff was unable to perform any past relevant work.

7.   Plaintiff was born on May 17, 1965 and was 45 years-old, which is defined as a younger individual age 18-44, on the date last insured. Plaintiff subsequently changed age category to a younger individual age 45-49.

8.   Plaintiff has a limited education and is able to communicate in English.

9.   Transferability of job skills is not material to the determination of disability, because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not plaintiff has transferable job skills.

10.  Through the date last insured, considering plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that plaintiff could have performed.

11.  Plaintiff was not under a disability, as defined in the Social Security Act, at any time from August 4, 2010, the alleged onset date, through December 31, 2010, the date last insured.

(Tr. 17-37).

## IV.   Legal Standards

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187

(8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." Lacroix v. Barnhart, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. Id.

"Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically determinable

impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." Moore, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner, 646 F.3d at 558 (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether a claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove her RFC and establish that she

cannot return to her past relevant work.  Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001).  See also 20 C.F.R. § 404.1520(f).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V.  Discussion

To be entitled to disability benefits under Title II, plaintiff has the burden of showing that she was disabled prior to December 31, 2010, the date she was last insured.  Jenkins v. Colvin, No. 2:12-CV-91 (JAR), 2014 WL 1259771, at *2 (E.D. Mo. Mar. 26, 2014); see also 20 C.F.R. § 404.130; Moore, 572 F.3d at 522; Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006).  "Evidence from outside the insured period can be used in 'helping to elucidate a medical condition during the time for which benefits might be rewarded.'"  Cox, 471 F.3d at 907 (quoting Pyland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998).  However, to be entitled to benefits, plaintiff must prove she was disabled before her insurance expired.  Id.

Plaintiff argues that the ALJ improperly evaluated the evidence regarding pain in assessing plaintiff's RFC by failing to apply the standard set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).  A claimant's subjective complaints may be discounted if there are inconsistencies in the record as a whole.  20 C.F.R. §§ 404.1529, 416.929; McKinney v. Apfel, 228 F.3d 860, 864 (8th Cir. 2000); Polaski, 739 F.2d at 1322.  The

Eighth Circuit in <u>Polaski</u> set forth factors a court must consider in evaluating the credibility of a plaintiff's testimony and complaints, in addition to the objective medical evidence. These factors include:

> (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.

<u>Moore</u>, 572 F.3d at 524 (citing <u>Polaski</u>, 739 F.2d at 1322).

As to plaintiff's diabetes and foot pain, the ALJ found that the objective medical evidence in the record did not corroborate plaintiff's allegations of significant neuropathy during the relevant time period. (Tr. 27). She reported bilateral foot pain in August 2008 (Tr. 301-303), but an EMG evaluation was normal for both the legs and feet. (Tr. 237-38). An examination in September 2008 was consistent with bilateral tarsal tunnel entrapment. The examining physician at that time opined that plaintiff could have underlying diabetic neuropathy, but did not feel surgery was mandatory and instead preferred to utilize non-operative intervention, which he determined was "absolutely reasonable." (Tr. 238). Plaintiff reported complaints of bilateral toe numbness in August 2009, but upon examination her feet were without edema, atrophy or redness. (Tr. 279-82). She was wearing flip-flops, had palpable pedal pulses, and a normal range of motion. In June 2010, Dr. Smith noted that plaintiff had a small blister on her right foot, which was healing without signs of infection. (Tr. 261). In January 2011, after the expiration of her insured status, Dr. Grimes noted in an appointment that plaintiff's feet looked good. (Tr. 369). On September 22, 2011, Dr. Coulis, who completed a Physical Residual Functional Capacity Assessment for plaintiff, likewise noted that primary care medical evidence of the past year had not included any

mention of pain in plaintiff's feet or other neuropathic syndromes, either as an office complaint or a physical finding.  (Tr. 372-77).

The ALJ noted that plaintiff did not complain of any neuropathic-type pain until after her last insured date.  (Tr. 27).  In January 2012, she reported experiencing feet and leg numbness and tingling, but her diabetes was well-controlled and an examination of her feet was normal.  (Tr. 457-62).  Similarly, in July 2012, plaintiff reported numbness and tingling in her feet, but her foot exam was normal and her diabetes under control.  (Tr. 483-86).  Furthermore, as noted by the ALJ, the medical evidence shows that plaintiff's diabetes was consistently reported as well-controlled with Metformin, at-home monitoring with a blood glucose meter, and with dietary restrictions during the relevant period.

With regard to plaintiff's lower back pain, the ALJ noted that the evidence did not demonstrate severe back pain or an abnormal spinal process in 2010.  (Tr. 27).  In October 2008, plaintiff reported pulling a lower back muscle while carrying things into the house.  (Tr. 298-301).  She was instructed to use over-the-counter pain medications and avoid heavy lifting.  In December 2009, plaintiff experienced a lumbar sprain when she fell on her back while getting out of a car.  (Tr. 272-74).  In June 2010, she reported lower back and buttock pain from doing yard work and push-mowing on uneven ground at home.  (Tr. 260-63).  Dr. Smith noted that plaintiff's range of motion was mildly limited, and taught her lower back exercises.  In August 2010, while bending over to move some furniture, plaintiff stated she "felt something rip."  (Tr. 258-60).  On examination, the range of motion in her back was moderately limited.  Dr. Smith prescribed pain medication and advised physical therapy.  Plaintiff did not present further complaints of back pain during the relevant period.  The ALJ found that during the relevant period, plaintiff's back pain was treated effectively with

pain medications and the application of heat.  The ALJ also noted that while plaintiff testified to using a cane to ambulate prior to her last insured date, no records support that assertion.

The ALJ also found other factors weighed against plaintiff's credibility as to her subjective complaints.  With respect to plaintiff's daily activities, the ALJ noted that her reported daily activities exceeded the limitations she alleged.  (Tr. 29).  While plaintiff testified she could not get out of bed unassisted, she reported doing yard work, push-mowing on uneven ground, and moving furniture in her home near the alleged onset date of her disability.  (Tr. 260-63); see Riggins v. Apfel, 177 F.3d 689, 692 (8th Cir. 1999) (stating that the ALJ noted the claimant's daily activities were inconsistent with his complaints of disabling pain, as the claimant's daily activities included: "driving his children to work, driving his wife to school, shopping, visiting his mother, taking a break with his wife between her classes, watching television, and playing cards"). Additionally, while treating physicians regularly advised physical therapy for plaintiff, she was both resistant to and noncompliant with her physical therapy regimen.  (Tr. 279, 400, 448); see Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005) ("A failure to follow a recommended course of treatment also weighs against a claimant's credibility.").

Finally, the ALJ took note of plaintiff's poor work history.  From the time plaintiff attained the age of majority until the alleged onset date of her disability—a twenty-seven year span of time—there were only four years in which plaintiff achieved earnings demonstrating a full year's engagement in substantial gainful activity.  (Tr. 29).  Even though the onset of her disability was not until August 2010, plaintiff achieved no earnings after 2008.  The ALJ opined that plaintiff's poor work history in the years preceding her alleged onset date of disability suggests that her unemployment in 2010

was due to non-medical factors.  See Woolf v. Shalala, 3 F.3d 1210, 1214 (8th Cir. 1993) (noting that a poor work history can lessen a claimant's credibility).  Indeed, plaintiff reported that she quit her last job because "it wasn't worth it."  (Tr. 229).

The Court may defer to the ALJ's credibility assessment as long as it is supported by good reasons and substantial evidence.  Guilliams, 393 F.3d at 801.  Here, the ALJ determined that plaintiff's allegations regarding the severity of her physical impairments during the relevant period was diminished by the lack of corroborating medical evidence, poor treatment history, her evasive testimony, her poor work history, and her daily activities.  The ALJ thus properly considered the factors outlined in Polaski and articulated valid reasons for discounting plaintiff's allegations of pain.

### VI.   Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**.

A separate Judgment in accordance with this Memorandum and Order will be entered this same date.


_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE


Dated this 26th day of February, 2015.